## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MOHAMMAD RAHMAN d/b/a, 7-11 FRANCHISE 11306 and ALVARO T. GRACIAS<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL CHERTOFF, Secretary of the U.S. Dept. of Homeland Security; EMILIANO GONZALEZ, Director, U.S. Citizenship and Immigration Services; ROBERT P. WIEMANN, Director, Administrative Appeals Office; PAUL NOVAK, Director U.S. Citizenship and Immigration Services Vermont Service Center.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.: 07-434-*** |

## PLAINTIFFS' OPENING BRIEF

Charles M. Oberly, III (No. 743)
Karen V. Sullivan (No. 3872)
Oberly, Jennings & Rhodunda, P.A.
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE 19899
(302) 576-2000 – Telephone
(302) 576-2004 – Facsimile
coberly@ojlaw.com
ksullivan@ojlaw.com

-and-

David E. Piver
The Law Office of David E. Piver
150 Strafford Ave, Suite 115
Wayne, PA 19087
(610) 975-4599 – Telephone
(610) 687-2100 – Facsimile
*Attorneys for Plaintiffs*

Dated:  January 2, 2008

## TABLE OF CONTENTS

                                                                                                      Page

TABLE OF AUTHORITIES………………………………………………………………...ii

I.      INTRODUCTION……………………………………………………………………1

II.     ISSUE PRESENTED ON APPEAL…………………………………………………1

III.    FACTS AND PROCEDURAL HISTORY…………………………………………..2

IV.     LEGAL FRAMEWORK………………………………………………………….…..6

V.      SUMMARY OF THE ARGUMENT……………..…………………………………7

VI.     ARGUMENT……………………………………………………………………11

        A.      The AAO's Denial of the I-140 Filed on Behalf of Mr. Gracias Was
                Erroneous as a Matter of Fact and Law…………………………………11

                1.      The AAO's complete disregard for the $50,000 line of credit
                        Mr. Rahman had access to was erroneous because his access
                        to that line of credit in and of itself demonstrates Mr. Rahman's
                        ability to pay the proffered wage………………………………......11

                2.      In addition to his access to a line of credit well in excess of the
                        proffered wage, other sources of finances as documented in the
                        record would have compelled as reasonable fact finder to
                        conclude that Mr. Rahman had the ongoing ability to pay the
                        proffered wage……………………………………………………...14

        B.      The Denial of the I-140 Filed By Mr. Rahman on Mr. Gracias' Behalf Was
                Irrational, Arbitrary, and Capricious and Therefore an Abuse of
                Discretion……………………………………………………………………...22

                1.      The AAO's decision in this case irrationally and inexplicably
                        Departed from published guidelines for demonstrating the
                        Ability to pay and therefore it cannot be upheld on appeal……………..22

                2.      The AAO's decision in this case constitutes error as a matter of
                        law because it disregarded an expert analysis of the financial
                        documents in the record in favor of its own non-expert analysis
                        of the documents in the record……………………………………...26

VII.    CONCLUSION…………………………………………………………...…………..32

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page**

*Abdille v. Ashcroft*, 242 F.3d 477 (3d Cir. 2004)……………………………………………………7

*Amanfi v. Ashcroft*, 328 F.3d 719 (3d Cir. 2003) …………………………………………………..23

*Ambartsoumian v. Ashcroft*, 388 F.3d 85 (3d Cir. 2004)…………………………………………27-28

*American Federation of Labor v. Chertoff*, 2007 WL 2972952 (N.D.Cal. 2007)..…………......26

*Berishaj v. Ashcroft*, 378 F.3d 314 (3d Cir. 2004) …………………………………………………9, 28

*Butt v. Gonzales*, 429 F.3d 430 (3d Cir. 2005)…………………………………….....12, 13, 14, 31-32

*Caushi v. Attorney General*, 436 F.3d 220 (3d Cir. 2006)…………………………….…………..8, 9

*Dia v. Ashcroft*, 353 F.3d 228 (3d Cir. 2003)…………………………………….……...7, 8, 12, 15, 22

*Heckler v. Chaney*, 470 U.S. 821 (1985)………………………………………...…………………23

*Hondros v. U.S. Civil Service Commission*, 720 F.2d 278 (3d Cir. 1983)………..………….23, 24

*In re: Petitioner*, 2004 WL 2897077 (INS Apr. 15, 2004)...……………………………………17

*INS v. Yang*, 519 U.S. 26 (1997) ………………………………………………….........9, 23, 26

*Jishiashvili v. Attorney General*, 402 F.3d 386 (3d Cir. 2005)……………………….…...……12-13

*K.C.P. Food Co., Inc., v. Sava*, 623 F. Supp. 1080 (S.D.N.Y. 1985)……………………18, 19, 20

*Ki Se Lee v. Ashcroft*, 368 F.3d 218 (3d Cir. 2004)………………………….……...10, 11, 29, 31

*Leia v. Ashcroft*, 393 F.3d 421 (3d Cir. 2005) …………………………………….……10, 27, 28

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ……………………………………………...……………23

*Lukwago v. Ashcroft*, 329 F.3d 157 (3d Cir. 2003)…………………………………...……….28

*Matter of Michael Herz Assoc.*, 19 I&N Dec. 558 (Comm. 1988) ………….….………22, 26

*Matter of Ranchito Coletero*, 2002 INA 105 (Jan. 8, 2004) ……………………………….…17

*O'Conner v. Attorney General*, 1987 WL 18243 (D. Mass. 1987) ………….....11, 17, 18, 19, 20

**Cases**                                                                                        **Page**

*Partyka v. Attorney General*, 417 F.3d 408 (3d Cir. 2005)……………………………………….7

*Purveegiin v. Gonzales*, 448 F.3d 684 (3d Cir. 2006) …………………………………………..23

*Sevoian v. Ashcroft*, 290 F.3d 166 (3d Cir. 2002) ……………………………………………24

*Sitar Restaurant v. Ashcroft*, 2003 WL 22203713 (D. Mass 2003) ……………………………..17

*Smriko v. Ashcroft*, 387 F.3d 279 (3d Cir. 2004) …………………………………………....7

*Tongatapu Woodcrafts Hawaii, Ltd., v. Feldman*, 736 F.2d 1305 (9th Cir. 1984) ………....18, 19

*Ubeda v. Palmer*, 539 F. Supp. 647 (N.D. Ill. 1982) ……………………………………...18, 19

*U.S. v. Ryan-Webster*, 353 F.3d 353 (4th Cir. 2003)……………………………………….....2

*Zhang v. Ashcroft*, 382 F.3d 993 (9th Cir. 2004) ………………………………………...…27

**United States Code**

5 U.S.C. § 706 …………………………………………………………………...…7, 22

28 U.S.C. §1746 …………………………………………………………………………..2

**United States Regulations**

8 C.F.R. § 204.5(g)(2)………………………………………………………………………..6

8 C.F.R. § 274a.12(C)(9) …………………………………………………………………....5

20 C.F.R. § 656.26 …………………………………………………………………….....17

**Miscellaneous Authorities**

Christine M. Flowers, *Ability to Pay Issues For the Small Business*,
Immigration Law Daily (2004), at
*http://www.ilw.com/articles/2004,1223-flowers.shtm* …………………………………………7

Romulo Guevara, *Procedural and Policy Changes For I-140 Petitions*,
Immigration Law Daily (2004), at
http://www.ilw.com/articles/2004,0624-guevara.shtm…………………………...…22, 23, 24, 25

## I.     INTRODUCTION

This is an immigration matter in which the Plaintiffs, Mohammad Rahman d/b/a 7-11 Franchise 11306 and Alvaro Gracias seek judicial review of the denial of the I-140 Petition for Alien Worker (hereinafter "I-140") by the Administrative Appeals Unit of the U.S. Department of Homeland Security (hereinafter "AAO").[1]  The denial of the I-140 by the United States Citizenship and Immigration Services Vermont Service Center (hereinafter "Vermont Service Center") and the AAO decision upholding it were legally and factually erroneous, and this Court must now sustain Plaintiffs' arguments on appeal and enter declaratory judgment in their favor ordering USCIS to approve the I-140 filed on Gracias' behalf by Rahman.  In the alternative, and at a minimum, based on the facts and law discussed below, the Plaintiffs assert that this Court should sustain their appeal and remand the case to USCIS for further consideration.

## II.     ISSUE PRESENTED ON APPEAL

Whether the USCIS erred as a matter of fact and law and abused its discretion in denying the Appellants' I-140 based on the Vermont Service Center's and AAO's determination that Rahman's filings did not demonstrate that he had the ongoing ability to pay Gracias the proffered wage of $38,740?[2]

---

[1] The filing of an I-140 is the middle step in the process of the employer sponsored permanent presidency process for foreign workers. The I-140 is filed with the United States Citizenship and Immigration Service (hereinafter "USCIS") after the U.S. Department of Labor (hereinafter "DOL") certifies an Application for Alien Labor Employment Certification (hereinafter "ETA-750").  In this case, the DOL Certified Rahman's ETA-750 on March 3, 2003.  *See* Record of Proceeding at 146 (D.I. 7) (hereinafter "A.R. __"). Assuming that the I-140 an employer files on behalf of a proposed employee is approved, the third and final step in this process is for the employee to file an Application to Adjust to Permanent Resident Status on Form I-485 (hereinafter "I-485").  As the record in this case demonstrates, this third and final step in the employment based U.S. immigration policy is dependent upon USCIS' approval of the I-140.

[2] Appellants preserved this issue for appeal in their briefs and memoranda submitted to the Vermont Service Center and AAO.  *See generally* Plaintiffs' AAO Appellate Brief, A.R. 14-20.

### III.    FACTS AND PROCEDURAL HISTORY

The Plaintiff Rahman owns and operates 7-11 Franchise 11306 in Wilmington, Delaware. *See, e.g.,* AAO Decision at 1, A.R. 1.  He has owned and operated this business since 2001.  *See, e.g.,* AAO Decision at 8; A.R. 8 (noting that Rahman's tax returns indicate that he purchased the 7-11 Franchise in 2001).  On July 29, 2002, Rahman initiated the employment-based immigration process on Mr. Gracias' behalf by filing Form ETA-750 with DOL.  *See generally* ETA-750, A.R. 145-49. As certified, Form ETA-750 specifies the terms and conditions of Mr. Gracias' proposed employment with Rahman's 7-11 franchise and the process associated with form ETA-750 demonstrates that by potentially employing Gracias Mr. Rahman would not be displacing a qualified and available American worker.  *See id*. at 146; *see also U.S. v. Ryan-Webster*, 353 F.3d 353, 355-56 (4th Cir. 2003) (discussing labor certifications process and stating, "When issued, a Labor Certification evidences the DOL's acknowledgment of two predicate facts: (1) sufficient United States workers are not able, willing, qualified, and available for a particular job; and (2) employment of a particular alien will not adversely effect the wages and working conditions of United States workers similarly employed."). As specified in the ETA-750 in this case, Mr. Gracias was to become the manager of Rahman's 7-11 Franchise in Wilmington, Delaware.  *See* A.R. 146.  In signing and submitting the ETA-750 to the DOL, Rahman attested under penalty of perjury to pay Mr. Gracias $745 per week, or $38,740 per year, in exchange for his services as a Manager.  *Id*.[3]  Upon certification, Mr. Rahman was then eligible to file an I-140 on Gracias' behalf.  The I-140 in this case was filed by Rahman on Gracias' behalf on or around April 21, 2003.  *See* I-140 Filing Letter, A.R. 173.

---

[3] This proffered wage of $38,740 is set by DOL as the "prevailing wage."  In submitting a signed ETA-750 to the DOL the employer is attesting under the penalty of perjury in accordance with 28 U.S.C. § 1746 to comply with and pay the proffered wage to a proposed employee upon approval.  *See* ETA-750 at 2, A.R. at 147.

When Mr. Rahman filed the I-140 on Gracias' behalf, he submitted substantial evidence of his ability to pay the proffered wage in support of that petition. *See, e.g.*, A.R. 173-74 (listing documents submitted in support of Rahman's I-140). Included in these documents were Rahman's tax returns, other documents detailing his personal finances and materials explaining the supporting financial relationship between 7-11 and its franchisees. *Id*. Although Rahman believed that these materials were sufficient to demonstrate his ability to pay Gracias the proffered wage, the Vermont Service Center disagreed and, on March 29, 2004, issued a document known as a Request for Additional Evidence (hereinafter "RFE") in response to Rahman's initial filing. *See* I-140 RFE, A.R. 176-77 (requesting further evidence of Rahman's ability to pay Gracias the proffered wage).

Rahman responded to the Vermont Service Center's RFE by timely submitting further substantial evidence in support of his ability to pay the proffered wage on June 22, 2004, as well as a detailed legal argument articulating the reasons why Mr. Rahman could afford to pay Mr. Gracias the proffered wage in accordance with the approved ETA-750. *See generally* RFE Response, A.R. 178-260. In particular, Rahman retained the services of a certified public accountant (hereinafter "CPA") to assess his financial situation and specifically offer his expert opinion and analysis of Rahman's ability to pay the proffered wage. *See generally* Caputo Letter, A.R. 35-37. Rahman submitted the accountant's report concerning the financial health of his business with his RFE response. *Id*. That report concluded that Rahman clearly had the ability to pay the proffered wage despite the negative or small profits shown on his tax returns due to his choice of accounting methods. *Id*. Ultimately, the CPA described in great detail why the evidence in the record, as well as standard business practices, demonstrated that Rahman could pay the proffered wage pursuant to the terms specified in the approved ETA-750. *Id.*

Despite these detailed submissions, on September 22, 2004, the Vermont Service Center denied the I-140 filed by Rahman on Gracias' behalf.  USCIS I-140 Denial, A.R. 11-13.  In response to the Vermont Service Center's denial of the I-140 filed on Gracias' behalf, Mr. Rahman timely filed an appeal with the AAO on October 26, 2004.  *See* I-290B Filing Receipt, A.R. 10.  In his brief in support of that appeal, Rahman presented the evidence that he submitted to the Vermont Service Center in support of the I-140 filed on Gracias' behalf and argued that the Vermont Service Center's denial of that petition was erroneous because it failed to meaningfully consider the totality of Rahman's financial circumstances as a sole-proprietor.  *See* A.R. 21-99 (containing evidence submitted by Rahman in support of his AAO Appeal).

After setting forth the legal framework for assessing whether an employer has demonstrated its ability to pay a prospective employee's proffered wage and summarizing Rahman's arguments on appeal, the AAO summarized the evidence submitted by Rahman in support of the I-140 filed on Gracias' behalf and determined that the evidence did not demonstrate that Rahman had the ability to pay Gracias' proffered wage.  *See* AAO Decision at 4-9, A.R. 4-9.  The AAO rejected Rahman's argument that the case law that the Vermont Service Center based its denial on was inapplicable to the instant matter because of the fact that Rahman is a sole proprietor, whereas the businesses involved in the cases cited by the Vermont Service Center for support were incorporated businesses.  *See* A.R. 5.  Second, the AAO did not accept Rahman's assertion that the reason why his tax returns demonstrated losses or small profits was directly related to his choice of accounting method selected for tax purposes, not immigration purposes, to reduce or eliminate his tax liability.  *Id*.  The AAO refused to assess Rahman's ability to pay the proffered wage as a sole proprietor in any way other than the manner in which

4

he presented his finances to the IRS for tax purposes because it believed that it had no obligation to do so. *Id.*

Next the AAO discarded the Petitioner's assertions regarding his ability to pay the proffered wage as indicated on the cash flow statements submitted by Rahman in support of his I-140. *Id.* at 6. The AAO stated that these reports were not demonstrative of his ability to pay the proffered wage because they were not audited. *Id.* In a related note, the AAO also discounted the Petitioner's attestation that his wife's position's duties, who was employed at the 7-11 for the period of time during the pendency of the I-140, would be replaced by Gracias when his I-140 and subsequent I-485 employment authorization were approved for Gracias, and that the money used to compensate her in the past would be available in the future to compensate Gracias. *Id.*[4] The AAO said that, even if it were to consider wages paid to Rahman's wife in the past as potential money available to compensate Gracias in the future, this argument was severely undercut by the fact that Rahman did not describe what his wife's duties were at the 7-11, and therefore it could not ascertain whether Gracias would actually be replacing her. *Id.*

In addition, the AAO rejected Rahman's arguments that his personal assets, his access to a $50,000 line of credit, his satisfaction of several significant financial obligations, which would free up additional financial resources for Rahman to use to pay the proffered wage and support his family, and evidence that the business years of 2002 and 2003 were anomalous, demonstrated that he had the ongoing ability to pay Gracias the proffered wage. *Id.* at 6-9. For these reasons, the AAO stated that the Vermont Service Center properly denied the I-140 because Rahman

---

[4] Once an alien properly files an I-485, he is eligible to apply for and receive an employment authorization document which he can renew for the period of time that his I-485 is pending with USCIS. *See* 8 C.F.R. § 274a.12(c)(9).

failed to demonstrate that he had the ongoing ability to pay the proffered wage to Gracias for the required period.

As set forth *infra*, the AAO's decision to uphold the Vermont Service Center's denial of the I-140 filed on Gracias' behalf by Rahman was erroneous as a matter of fact and law and an abuse of discretion.  Accordingly, Plaintiffs respectfully request that this Honorable Court enter declaratory judgment in their favor and order USCIS to approve the I-140 filed on Gracias' behalf by Rahman.  Alternatively, and at a minimum, Plaintiffs request that this Honorable Court enter judgment on their behalf and remand this case to the AAO for further consideration of the totality of the Petitioner's financial circumstances as a sole proprietor consistent with the facts and law as discussed in detail below.

## IV.    LEGAL FRAMEWORK

This case concerns a single USCIS regulation.  *See* 8 C.F.R. § 204.5(g)(2)*; see also* AAO Decision at 2, A.R. at 2.  In order to successfully petition for an immigrant worker by filing an I-140, a prospective employer must demonstrate that he has the ability to pay the proffered wage as specified on the ETA-750.  *See id*.  The regulation requires the employer to show that he has the financial ability to pay the proffered wage from the date that he files the ETA-750 with the U.S. Department of Labor until the date upon which the proposed employee obtains U.S. Permanent Residency.  8 C.F.R.  § 204.5(g)(2).  A prospective employer's ability to pay the proffered wage is determined by analyzing the petitioning employer's annual reports, his tax returns, or audited financial statements.  *Id*.  Furthermore, in "appropriate cases," USCIS can consider an employer's ability to pay the proffered wage based on other sources of evidence, such as "profit/loss statements, bank account records, or personnel records."  *Id*.  Accordingly, based on the framework established by 8 C.F.R. § 204.5(g)(2) and the facts in this case as

6

discussed above, in order for Rahman to prevail on the merits of this case, he must demonstrate that he had the ability to pay Gracias the proffered wage from July 29, 2002, the date that he filed an ETA-750 with the Department of Labor, until April 22, 2003 – the date upon which Gracias applied for permanent residency with the Department of Homeland Security.[5]

This Honorable Court reviews allegations of legal error brought under the Administrative Procedure Act *de novo*. *See, e.g., Partyka v. Attorney General,* 417 F.3d 408, 411 (3d Cir. 2005); *see also Smriko v. Ashcroft*, 387 F.3d 279, 282 (3d Cir. 2004). This Honorable Court reviews the factual errors of administrative adjudicators to determine whether substantial evidence in the record would compel a reasonable mind to overturn the underlying decision. *See*, *e.g.*, *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003); *see also Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2004).   Based on the facts in the record and the law as discussed in detail below, Plaintiffs respectfully assert that the AAO erred as a matter of law and fact and abused its discretion in denying his I-140.  Accordingly, Plaintiffs respectfully request that this Honorable Court reverse the AAO's denial of that Petition and enter judgment in the Plaintiffs' favor.

## V.    SUMMARY OF THE ARGUMENT

The AAO's denial of Rahman's I-140 was an abuse of discretion because it was arbitrary, capricious, irrational and contrary to the law.  *See* 5 U.S.C. § 706.  When the facts contained in

---

[5] On at least one occasion, the Service has stated in published opinions that in the year in which an employer files an ETA-750, he is only required to demonstrate that he has the ability to pay the pro-rated proffered wage for the portion of the year that remains as of the date the ETA-750 is filed.  *See, e.g.*, Christine M. Flowers, *Ability to Pay Issues For the Small Business*, Immigration Law Daily (2004), at *http://www.ilw.com/articles/2004,1223-flowers.shtm* (discussing non-precedential AAO decision in which the AAO made the "eminently reasonable determination" that a petitioning employer need only pay the prorated share of a proffered wage for the year in which he files an I-140) (attached hereto as Exhibit A). Accordingly, in this case Gracias had to demonstrate that he had the ability to pay Gracias 42.7% of the proffered wage in 2002.  *Id*.  42.7% of the proffered wage in this case amounts to $16, 542.

the record are correctly assessed in light of the binding and persuasive case law, a reasonable fact finder would be compelled to conclude that the AAO's decision must be overturned for five primary reasons. First, the AAO's decision indicating that it might have considered "existent loans," but not Rahman's $50,000 line of credit (an amount well in excess of the proffered wage) was arbitrary and capricious because the AAO's decision to consider one form of credit as evidence of the ability to pay a proffered wage, but not another does not "flow in a reasoned way" from the facts in the record. *See, e.g., Caushi v. Attorney General,* 436 F.3d 220, 226 (3d Cir 2006) (citing *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2001)); *see also infra*, pp. 11-14.

Second, the AAO's decision must be reversed because it failed to meaningfully consider other evidence in the record that, when properly considered as a whole, demonstrates that Rahman had the ongoing ability to pay Gracias the proffered wage from the resources of this business and his personal resources available to his business. *See infra*, pp. 14-21. This evidence included documents related to Rahman's checking account and retirement savings account, the fact that he had recently satisfied several significant personal financial obligations, an expert analysis of his overall financial situation by a CPA, and several other documents discussing a 7-11 franchisee's relationship with the 7-11 corporation. *Id.* Because Rahman's 7-11 franchise is structured as a sole-proprietorship, his unfettered ability to draw upon portions of all of his assets, credit, and other business resources is something that the AAO failed to consider in a meaningful manner. *See, e.g.,* AAO Decision at 6, A.R. at 6 (discussing fact that Rahman had satisfied the loan and completed the car payments on his BMW). Because the AAO failed to meaningfully consider the totality of Rahman's financial circumstances as a successful owner-operator of an internationally recognized franchise business, its decision cannot be squared with

the evidence in the record, and, therefore, its decision amounts to an abuse of discretion that should now be overturned. *See, e.g.*, *Caushi*, 436 F.3d at 226.

This Court should also overturn the AAO's decision for a third reason – because it irrationally departs from standards published by the Vermont Service Center to be used by USCIS adjudicators to assess an employer's ability to pay the proffered wage in effect at the time the I-140 in this case was filed. *See infra*, pp. 22-26. In 2002 when Rahman submitted the I-140 on Gracias' behalf, the Vermont Service Center adjudicated I-140s pursuant to the standards issued in a policy memorandum published in 1994 containing standards that were considerably more flexible than the standards in place in 2004 when the AAO denied Plaintiffs' appeal. *See id*. Because its decision in 2004 appears not to have applied the standards in place at the time the I-140 was filed, its decision is a departure from established agency guidelines and is, therefore, an abuse of discretion. *See, e.g.*, *INS v. Yang*, 519 U.S. 26, 32 (1997) (stating that when an agency voluntarily circumscribes its adjudicative discretion it must consistently adhere to its own guidelines).

Fourth, the AAO's decision cannot be upheld is because its treatment of the expert assessment by Rahman's CPA violates precedential case law concerning the deference that administrative adjudicators should give to expert analysis of the facts in a case provided by individuals seeking immigration benefits. *See infra*, pp. 26-32. The Third Circuit has repeatedly held in the immigration context that administrative fact finders are "obliged" to meaningfully consider evidence submitted by individuals seeking immigration benefits in support of their cases. *See, e.g.*, *Berishaj v. Ashcroft*, 378 F.3d 314, 325 (3d Cir. 2004). Part and parcel of meaningful consideration of the evidence submitted by aliens in support of their cases is giving deference to expert analysis of the facts provided by individuals seeking immigration benefits

9

when such evidence is submitted.  *See Leia v. Ashcroft,* 393 F.3d 421, 434-35 (3d Cir. 2005)

(finding administrative adjudicator's determination that specific expert assessment in the record

was "just totally irrelevant" to be reversible error).   In this case, the AAO essentially deemed the

letter from Mr. Rahman's CPA as "totally irrelevant" because it was unaudited.  *See, e.g.,* AAO

Decision at 5; A.R. at 5 (dismissing Caputo's analysis of Rahman's finances because of the

manner in which his earnings are reported to the IRS for tax purposes).  In *Leia,* this level of

disregard for expert analysis of the facts in a case involving an individual seeking immigration

benefits was condemned by the Third Circuit and that case was remanded to the agency for

further consideration with proper deference accorded to the expert analysis of the financial

documents in the record in the case.  *See* 393 F.3d at 421.  Likewise, as discussed *infra* at pp. 26-

32, the AAO's decision in this case reflects an attempt by an executive agency charged with

interpreting immigration law to assert that it has expertise in financial analysis and tax law.  *See,*

*e.g.* AAO Decision at 5, A.R. at 5 (asserting that accountant Caputo's letter did not demonstrate

the ability to pay – even when Rahman's finances are viewed from an alternative method of

accounting).  The Third Circuit recognized in *Ki Se Lee v. Ashcroft*, that courts must provide due

deference to executive immigration agencies and their subdivisions, such as the AAO, only with

respect to immigration matters.  *See* 368 F.3d 218, 225 n.10 (3d Cir. 2004).  Because the AAO's

decision in this case attempts to substitute its own financial analysis of the documents in the

record for the expert analysis of the financial information in the record provided by a CPA, its

determination that the documents in the record failed to demonstrate that Rahman had the

ongoing ability to pay the proffered wage, must now be overturned.  *Id.*  Given the similarity

between the circumstances in *Leia* and the erroneous nature of the AAO's decision in this case,

as well as the AAO's impermissible attempt to assert expertise in finance or tax law as the Third

Circuit suggested was inappropriate in *Ki Se Le*, this Court should reverse the AAO's decision.

## VI.    ARGUMENT

A.    The AAO's Denial of the I-140 Filed on Behalf of Mr. Gracias Was Erroneous
<u>as a Matter of Fact and Law.</u>

The instant case is one that involves a sole-proprietorship franchise of a well-known

international franchisor.  USCIS recognizes that assessing the ability of a sole-proprietorship's to

pay the proffered wage requires a holistic analysis of the totality of the financial circumstances

of a sole-proprietor's business, including his personal finances. *See, e.g., O'Conner v. Attorney

General*, 1987 WL 18243 (D. Mass. 1987).  Here, the Vermont Service Center, as well as the

AAO failed to appropriately consider the facts in the record detailing the totality of Rahman's

finances which demonstrate his ability to pay the proffered wage as required. When the record in

this case is appropriately considered, a reasonable mind would be compelled to conclude that Mr.

Rahman had the ongoing ability to pay Mr. Gracias the proffered wage as stated on his ETA-750

and, therefore, also that his I-140 should have been approved by USCIS.

1.    The AAO's complete disregard for the $50,000 line of credit Mr. Rahman had
access to was erroneous because his access to that line of credit, in and of
<u>itself, demonstrates Mr. Rahman's ability to pay the proffered wage.</u>

The first error in the AAO's analysis of this case was its incorrect treatment of the fact

that Mr. Rahman possessed a $50,000 line of credit with Wachovia Bank; Mr. Rahman's access

to that line of credit, in and of itself, exceeds the proffered wage.  *See* AAO Decision at 7; A.R.

7.  Although the AAO labeled the use of lines of credit as "an integral part *of any business

operation*," it irrationally discarded Mr. Rahman's ability to access his line of credit as evidence

of his ability to pay the proffered wage.  As a sole-proprietor, he had unfettered ability to use his

line of credit for any purpose he saw fit – including paying the proffered wage to Mr. Gracias.

*See id.* The AAO's statements regarding Mr. Rahman's ability to use his line of credit to supplement his business's ability pay the proffered wage in this case is internally inconsistent. The AAO stated that, although it would not consider the effect of Mr. Rahman's access to a $50,000 line of credit on his ability to pay the proffered wage, it might have considered an "existent loan" in the same amount. *Id.* (incorrectly excluding Mr. Rahman's access to a line of credit, while at the same time inferring that it would have considered other loans as evidence of his ability to pay the proffered wage). Lines of credit and loans, the latter of which the AAO stated could have been used by Rahman to demonstrate the ability to pay the proffered wage, are conceptually identical because both forms of credit depend on a financial institution's assessment of creditworthiness and both must ultimately be repaid to the lender. This schizophrenic attempt by the AAO, indicating that it would have considered loans already taken out by Mr. Rahman but not available credit issued to Mr. Rahman in the form of a line of credit from Wachovia Bank, defies common sense and fails the substantial evidence test. *See, e.g. Dia,* 353 F.3d at 350. Both forms of credit would require Rahman to be deemed credit worthy by a financial institution and eventually repay the lender. Accordingly, because the AAO's decision defies common sense, its decision runs afoul of precedential Third Circuit case law and must be overturned. *See Butt v. Gonzales*, 429 F.3d 430, 438 (3d Cir. 2005) (requiring all actions of administrative adjudicators to be based on common sense). Accordingly, this Honorable Court must reverse the AAO denial, and enter judgment in the Plaintiffs' favor.

In the immigration context, the Third Circuit has ruled time and again that administrative fact finders' decisions must be "grounded in the record" and that they must be based on "specific, cogent" reasoning. *See, e.g.*, *Dia v. Ashcroft*, 353 F.3d 328, 249-50 (3d Cir. 2001). In *Jishiashvili v. Attorney General*, the Third Circuit refined its general holdings in cases like *Dia*

and held that an administrative fact finder's decision that is internally inconsistent, such as the

AAO's decision in this case, with respect to treating two very similar forms of credit differently

cannot be upheld on appeal.  *See* 402 F.3d 386, 296 (3d Cir. 2005).  When the holding in

*Jishiashvili* is applied to this case, it is clear that this Honorable Court should reverse the AAO's

denial of Rahman's I-140 because of its failure to recognize the importance of Rahman's ability

to use his line of credit, if and as necessary, in order to pay Gracias the proffered wage rate. *See*

*id*.  In *Jishiashvili,* a fact finder stated that he believed that an alien seeking asylum was a

credible witness, but ultimately denied his asylum application without explaining why his

credible testimony about the persecution he experienced failed to qualify him for relief.  *Id*.  In

response to the fact finder's odd conclusion denying the alien the relief he was seeking after

labeling his testimony as credible, the Third Circuit stated that his decision was the product of

speculation and conjecture, rather than the product of "specific, cogent reason[ing]."  *Id*. at 396.

Although the facts and circumstances involved in *Jishiashvili* do not precisely dovetail with the

employment-based immigration context of the instant case, when the Third Circuit's general

reasoning and rationale in *Jishiashvili* are applied to the this case, it is clear that the AAO's

decision must be reversed because its reasoning with respect to the line of credit is speculative

and not cogent. If the AAO would have accepted proof that Mr. Rahman had more than the

amount of the proffered wage in available in existent loans, it defies common sense for the AAO

to suggest that he could not similarly use an existing line of credit for the same purpose because

both sources of credit are monies that are existing monies available to Rahman.  *See Butt v.*

*Gonzales,* 429 F.3d 430, 438 (3d Cir. 2005) (holding that, "In the law, as in all things, common

sense must be our guide); *see also Jishiashvili*, 402 F.3d at 396 (holding that in order to be

upheld on appeal fact finder's decisions must be internally consistent).

Likewise, the Third Circuit's decision in *Butt*, when applied to the facts in this case, should compel this Court to decide in the Plaintiffs' favor. In that case, also involving an asylum seeker, the Third Circuit condemned fact finding that revolved around a "strained interpretation" of the phrase "under the care of" in a letter from a doctor describing medical treatment that an asylum seeker received prior to fleeing to the United States. *See* 429 F.3d at 434-35. The fact finder in that case took the phrase "under the care of" to mean that the asylum seeker received continuous in-patient medical care for injuries he sustained, as opposed adopting to the commonly accepted commonsense meaning of that phrase – that he was simply receiving a course of treatment from a doctor for a specific period of time. *Id*. Again, although the facts here are not on all fours with those presented in *Butt*, the broader implications of the Third Circuit's decision in *Butt* demonstrate the erroneousness of the AAO's decision holding that Mr. Rahman's access to a $50,000 line of credit – an amount that in and of itself exceeds the proffered wage – did not demonstrate that he had the ongoing ability to pay the proffered wage. *See generally* 429 F.3d at 434-38; *compare* A.R. 7. Much like the inappropriate "strained" interpretation of the phrase "under the care of" in *Butt*, the AAO's attempt to suggest that one form of access to credit in excess of the proffered wage failed to demonstrate an ability to pay the proffered wage – even though it would have considered another source of credit as being available to satisfy his burden of demonstrating his ability to pay the proffered wage – cannot be upheld by this Honorable Court on appeal. *Id*. Accordingly, because Mr. Rahman possessed access to a $50,000 line of credit which he could have drawn on in order to pay the proffered wage, the AAO's decision was error as a matter of fact and law.

    2.    In Addition to His Access to a Line of Credit Well In Excess of the Proffered Wage, Other Sources of Finances as Documented in the Record Would Have Compelled a Reasonable Fact Finder to Conclude that Mr. Rahman Had the <u>Ongoing Ability to Pay the Proffered Wage.</u>

In addition to the fact that Mr. Rahman had the ongoing ability to pay the proffered wage because of his access to a line of credit in excess of the proffered wage itself, other financial resources documented in the record, when meaningfully considered as a whole, would have convinced a reasonable fact finder that Rahman had the ability to pay Gracias the proffered wage. Therefore, the AAO's denial of his I-140 was erroneous as a matter of fact and this Court cannot uphold its decision, and it should enter judgment in the Plaintiffs' favor. *See, e.g.*, *Dia*, 353 F.3d at 250. The record in this case contains several critical pieces of evidence that when, viewed through the lens of common sense and ordinary business practices, as documented and attested to by a CPA, demonstrate that the totality of Rahman's financial circumstances could amply afford the proffered wage. *See generally* AAO Decision at 1-9, A.R. 1-9 (citing reasons considered by the AAO as evidence that Mr. Rahman could not pay the proffered wage). For example, the AAO improperly rejected Mr. Rahman's argument that once Mr. Gracias began working for him, his wife would stop working at the 7-11, and that the wages previously paid to her would be available in the future to contribute to compensating Gracias. *See, e.g.*, Caputo Letter at 1, A.R. 35. Rahman's CPA, with professional knowledge of Rahman's financial circumstances, indicated this would free up substantial amounts of money annually that Rahman could use to pay the proffered wage. *Id.* The AAO *is* correct in noting that the wages paid to Mrs. Rahman in the past are not, in and of themselves, sufficient to pay the proffered wage, *but it was wrong* to discount the prospective effect of this available money because when the salary that Rahman was using to pay his wife in 2002 and 2003 are considered in light of the totality of his finances, this money is relevant and important in demonstrating his ability to pay the proffered wage. *See* AAO Decision at 6, A.R. 6; *compare* Caputo Letter at 1, A.R. 35.

In addition to his access to a form of credit that is regularly drawn upon by small owners

15

of businesses to cover expenses like payroll in order to expand and grow their businesses, Mr.

Rahman had substantial personal assets that he attested he was willing to use to pay for portions

of Mr. Gracias' salary on an as needed basis to invest into the growth of his businesses. *See*

Caputo 2002 Cash Flow Statement, A.R. 35. These assets include his personal checking

account, his Roth IRA, and the estimated value of his home. *Id.* These are all forms of liquid

capital commonly drawn upon by many sole-proprietors in the process of growing their

businesses. *Id.* The importance of each of these assets was addressed by the Plaintiffs in their

filings with USCIS and their relevance in terms of Rahman's ability to pay the proffered wage

was also addressed by the CPA in his expert discussion of the totality of Rahman's finances.

*See, e.g.,* RFE Filing Letter, A.R. 178-83; *see also* Caputo Letter A.R. 35-39. In its denial,

however, the AAO erroneously dismissed Caputo's professional analysis of Rahman's ample

financial resources available to Rahman because it did not believe that any of these assets on

their own demonstrated that Rahman had the ability to pay the proffered wage and because it did

not think that the evidence in the record provided a precise enough picture of how much money

could reasonably be derived from these assets in order to pay the proffered wage to Gracias. *See*

AAO Decision at 6, A.R. 6 (stating that there was not information in the record regarding how

much Mr. Rahman had been paying per month prior to paying off his loan for a BMW). The

AAO's assessment of this part of the record is technically accurate, in that none of these assets

alone listed by Rahman in his filing with USCIS demonstrate his ability to pay the proffered

wage. However, when they are considered in their totality, it is clear that the AAO's

consideration of these financial resources was flawed in that its own decision recognizes the

legal standard that in the case of a sole proprietorship USCIS must assess the "totality" of an

employer's finances as a whole in order to determine whether he or she has the ability to pay the

proffered wage, as well as support his family.  *See* AAO Decision at 3, A.R. 3.

In their brief to the AAO, the Plaintiffs relied upon a decision from the Board of Alien

Labor Certification Appeals (hereinafter "BALCA") to support the proposition that when

considering a sole proprietor's ability to pay a proffered wage, an administrative fact finder

should look at the *totality* of the proposed employer's finances, instead of merely looking at the

employer's business's financial documents.  *See* Plaintiffs' AAO Brief at 1, A.R. 14 (citing

*Matter of Ranchito Coletero*, 2002 INA 105 (Jan. 8 2004)).[6]  Because the Plaintiffs based their

argument to the AAO on a decision emanating from the DOL, the AAO stated that it was under

no obligation to consider these arguments.  AAO Decision at 3, A.R. 3 (stating that the AAO, as

part of the Department of Homeland Security did not have to defer to a decision from the

Department of Labor).  The AAO's categorical dismissal of the Plaintiffs' request to have the

totality of Rahman's finances considered by the AAO was unreasonable given the fact that this

argument has been endorsed in the context of demonstrating an potential employer's ability to

pay a proffered wage at the INS or DHS level by at least one U.S. District Court.  *See generally*

*O'Conner v. Attorney General*, 1987 WL 18243 (D. Mass. 1987).[7]

In *O'Conner*, the court held that because the AAO failed to look at the employers'

finances as a whole, the AAO's denial of an I-140 filed for a foreign employee was arbitrary and

---

[6] BALCA is an appellate tribunal within the U.S. Department of Labor that is responsible for
considering appeals filed by employers when they believe that the Department of Labor
erroneously denied an ETA-750 filed on behalf of a prospective employee.  *See* 20 C.F.R §
656.26 (discussing jurisdiction and role of BALCA in the Alien Labor Certification proceed).

[7] USCIS has attempted to suggest that *O'Conner* has been effectively overturned by a subsequent
unpublished decision from the U.S. District Court in Massachusetts.  *See, e.g.*, *In re Petitioner,*
2004 WL 2897077 (INS Apr. 15, 2004) (citing to *Sitar Restaurant v. Ashcroft*, Civ. A. 02-
30197-MAP, 2003 WL 22203713 (D. Mass Sept. 18, 2003).  However, the Massachusetts
Court's decision in *Sitar* is distinguishable from *O'Conner* and from this case because of the fact
that the potential employer in *Sitar* was organized as a corporation, as opposed to the sole
proprietorships at the heart of *O'Conner* and of this case.

an abuse of discretion. *See* 1987 WL 18243, *1.  In fact, the *O'Conner* court noted that financial

documents related to the employers' business, were merely "one aspect…of the entire financial

picture." *Id*.  Instead of narrowly fixating on the store's tax returns, the *O'Conner* court looked

at real estate owned by the petitioning employer, the business's reputation, past profitability, and

the fact that the store had been run successfully for ten years prior to the filing of the I-140 and

concluded that when the information in these documents was properly analyzed, the I-140 should

have been approved. *Id*. at *2.  Furthermore, the *O'Conner* court noted that the cases cited by

the INS to support its denial were distinguishable from the facts in *O'Conner*.  *Id*. (distinguishing

*Ubeda v. Palmer*, 539 F. Supp. 647 (N.D. Ill 1982), *aff'd mem.*, 703 F.2d 571 (7th Cir. 1983),

*Tongatapu Woodcrafts Hawaii, Ltd. v. Feldman,* 736 F.2d 1305 (9th Cir. 1984), and *K.C.P. Food

Co., Inc. v. Sava*, 623 F. Supp. 1080 (S.D.N.Y. 1985) from facts in *O'Conner*).

        Interestingly, the cases that the *O'Conner* court found did not apply to that case are

substantially the same cases that the AAO used in this case to attempt to claim that Rahman did

not maintain the ability to pay the proffered wage.  *See generally* AAO Decision; A.R. 1-9.  This

Court should adopt the persuasive rationale employed by the *O'Conner* court and reject the list

of cases used by USCIS to deny Rahman's I-140.  For example, in *Ubeda*, the documents in the

record did not contain *any* information at all about the petitioning employer's ability to pay a

governess a wage of $6,000 per year beyond merely providing evidence of the prospective

employer's gross income.  *O'Conner*, 1987 WL 18243 at *2; *see also Ubeda*, 539 F. Supp. at

648, 650.  In Rahman's case, although his tax returns do not show profits in excess of the

proffered wage, his ample line of credit alone does.  Moreover, other documents in the record

indicate that the totality of Rahman's financial situation could support paying the proffered wage

to Gracias while at the same time providing for his family through a combination of his access to

18

credit, the value of his personal real estate, the fact that he satisfied his mortgage and car loan, his business's reputation as part of an large international franchise corporation, and because several of the profit-draining charges on his tax returns were clearly one-time expenses associated with the purchase of his 7-11 franchise from an earlier owner. *See, e.g.*, A.R. 21-99 (containing evidence submitted in support of Rahman's AAO appellate brief). Likewise, just as in *O'Conner*, the franchise that Rahman purchased was a going concern with substantial good will – a fact that the *O'Conner* court recognized as being significant to an employer's ability to pay a proffered wage. *O'Conner*, 1987 WL 18243 at *2. The AAO's summary dismissal of this fact was erroneous. This evidence separates this case from *Ubeda* in which no evidence other than documents related to the petitioner's gross income was submitted, and, therefore, as the court did in *O'Conner*, this Honorable Court, should overturn the AAO's decision.

Similarly, the *O'Conner* court rejected the AAO's use of *Tongatapu* and *K.C.P. Food Co.* in that case because those cases were distinguishable from the facts in *O'Conner*. *See* 1987 WL 18243 at *2. For example, the *O'Conner* court stated that INS' use of *Tongatapu* to deny the petitioning employer's I-140 in that case was inappropriate because of the fact that *Tongatapu* related to a new business which could not rely upon past success as a prediction for future performance. *Id.*; *see also Tongatapu*, 736 F.2d at 1310 (noting that petitioner in that case attempted to base entire ability to pay on predicted future earnings). However, the business in *O'Conner*, much like Rahman's 7-11, was a well-established business. *O'Conner,* 1987 WL 18243 at *2*; see* Caputo Letter at 1; A.R. 35 (noting the 7-11 franchise's longevity). Accordingly, as the *O'Conner* court did, this Honorable Court should recognize that the underlying facts in *Tongatapu* are so substantially different from the facts in this case that it should not have been relied upon by the AAO to deny of the I-140 filed on Gracias' behalf of

Rahman.

Finally, *O'Conner* rejected the AAO's reliance on *K.C.P. Food Co.*, *Inc.* because the documents in the record in that case "suggested an imminent demise" of the petitioner's business and "*no* financial ability to pay the beneficiary." *O'Conner*, 1987 WL 18243 at *2 (emphasis added). In this case, as discussed above and below, when the record is meaningfully considered as a whole, any reasonable fact finder would be compelled to conclude, either by relying solely on a line of credit in excess of the prevailing wage rate or that by utilizing some percentage of each of sources of financing discussed previously to which Rahman had unfettered access, he clearly had the ability to pay the proffered wage. *See generally* Caputo Letter, A.R. 35-38. Certainly nothing in the record in Rahman's case suggests that his business is about to collapse, as was the case in *K.C.P. Food Co*. *See* 623 F. Supp. at 1084-85; *compare generally* Caputo Letter, A.R. 35-38 (proving that Rahman maintained substantial cash balances at all times during the pendency of Gracias' visa petition). Therefore the AAO's flawed analysis should be reversed by this Honorable Court and judgment should be entered in favor of the Plaintiffs.

Lastly, the AAO's statements related to the payments appearing on Mr. Rahman's 2002 tax returns regarding 7-11 franchise start up costs must be rejected by this Honorable Court because objective evidence in the record supports Rahman's assertions that these were not recurring expenses and would not prevent him from being able to pay the proffered wage in the future or afford to hire Gracias at the time he filed the I-140 on his behalf. AAO Decision at 8-9, A.R. 8-9. In its denial, the AAO rejected Mr. Rahman's assertion that charges listed on his 2001 and 2002 tax returns were one-time only costs imposed by 7-11 on new franchisees and would not impede his ongoing ability to pay the proffered wage. *See* Caputo Letter at 2, A.R. 37 (discussing isolated nature of "7-11 Charges"). The AAO incorrectly claimed that there was

nothing in the record to support Mr. Rahman's assertion that these fees were indeed one time

events.  *See* AAO Decision 8-9; A.R. 8-9.  In addition to the evidence submitted by Rahman's

CPA, evidence elsewhere in the record indicates that there are substantial one-time payments that

a franchisee must make to the company when he purchases and opens a 7-11 store.  *See*

Documents printed from 7-11's corporate website, A.R. 169-72 (discussing start-up costs and

procedures of running a 7-11 Franchise).   While the 7-11 materials note that the franchise

charge will vary depending on the type of store that an individual is purchasing, those materials

do indicate that there is a one time $10,000 charge for security money as well as other variable

one-time start-up franchise fees.  *Id*.  Therefore, the AAO erred in failing to accept Caputo's

explanation of how these charges do not prevent Rahman from having the ongoing ability to pay

the proffered wage because evidence in the record explains both that the "7-11 charges" were not

actual events in which Rahman experienced an outflow of cash and that these charges were not

ongoing.  *See* Caputo Letter, A.R. 35-38.  As Caputo states in his letter, when Rahman's cash

position in 2002 is considered properly, even with these large one time charges listed on his 2002

tax returns for tax purposes, Rahman had a cash balance of $135,340 on hand in 2002 when he

filed for Gracias' I-140 – which is more than enough money to compensate Mr. Gracias pursuant

to the terms of the ETA-750 and support his family at the same time. *See* Caputo Letter at 2,

A.R. 37.   Accordingly, this Court should enter judgment in the Plaintiffs' favor and remand this

case to the AAO for approval of the I-140 filed by Rahman on Gracias behalf, or at a minimum

for further consideration.

Ultimately, the AAO's denial of the I-140 in this case suffers from its failure to consider

as a whole the facts and evidence in this case. Whether the ample line of credit is considered

alone, or if the information above is assessed in the aggregate, a reasonable fact finder would

have been compelled to conclude this business had the ample ability to pay the proffered wage. In the aggregate, Rahman's cash balance of $135,343 at the end of 2002 in excess of three times the proffered wage, his access to a line of credit that exceeded the proffered wage, the business's continuously improving bottom line and reputation as franchisee of an internationally known corporation, and the satisfaction of some of Mr. Rahman's personal debts, such as his car payment and his mortgage, proved that Rahman had the ongoing financial resources required for the ability to pay the proffered wage for the period of time required. *See Dia*, 353 F.3d at 250.[8]

    B.    The Denial of the I-140 Filed By Mr. Rahman on Mr. Gracias' Behalf Was Irrational, Arbitrary and Capricious and Therefore an Abuse of Discretion.

        1.    The AAO's Decision in this Case Irrationally and Inexplicably Departed From Published Guidelines for Demonstrating the Ability to Pay and Therefore it Cannot be Upheld on Appeal.

The AAO's decision in this case departs from protocol in effect at that time Mr. Rahman filed this I-140 on Mr. Gracias' behalf, when he responded to the Service's RFE related to that Petition, and when he filed his appeal with the AAO. *See, e.g.,* Romulo Guevara, *Procedural and Policy Changes For I-140 Petitions*, Immigration Law Daily (2004), at http://www.ilw.com/articles/2004,0624-guevara.shtm (discussing 1994 guidelines) (hereinafter "Guevara") (attached hereto as Exhibit B). Therefore, because the AAO's decision departs from this established protocol without providing a rational explanation for its departure, it must now be reversed by this Honorable Court pursuant to the Administrative Procedure Act. *See* 5 U.S.C. § 706.

From 1994 until 2004, petitioners filing I-140s at the Vermont Service Center on behalf

---

[8] It bears mention that in other business-immigration contexts, it is well settled that business owners are the best judges of what their companies need to do in order to be successful. *See Matter of Michael Herz Assoc.* 19 I&N Dec. 558 (Comm. 1988)(holding that business owners are better able to judge whether a proposed foreign employee has the skills required to perform a proposed job than federal agencies are).

of potential employees, filed these petitions pursuant to the guidelines contained in the minutes

from a 1994 meeting between the Vermont Service Center director and the AILA Service Center

Liaison. *See generally* Guevara. The minutes of that meeting established significant guidance as

to what potential employers need to demonstrate to the Service in order to demonstrate that they

have the ongoing ability to pay a proffered wage.  As discussed in detail below, the AAO's

denial of the Plaintiffs' petition in this case was irrational, arbitrary, and capricious because it

departed from these standards, which voluntarily constricted the Service's discretion to approve

of deny I-140s.  *See, e.g., INS v. Yang*, 519 U.S. 26, 32 (1997) (stating that when an agency

voluntarily circumscribes its adjudicative discretion it must consistently adhere to its own

guidelines); *see also Hondros v. United States Civil Service Commission*, 720 F.2d 278, 294 (3d

Cir. 1983) (recognizing that executive agencies are bound by policies announced in less formal

documents than formal rules or regulations).

It is well-settled law that certain acts are "absolutely committed" to agency discretion.

*See, e.g., Purveegiin v. Gonzales*, 448 F.3d 684, 689 (3d Cir. 2006).  However, clear precedent

from the Supreme Court and Third Circuit holds that the cases in which agency action is

"absolutely" discretionary are few and limited to cases in which "a court could have no

meaningful standard against which to judge the agency's action."  *Id.* (citing *Lincoln v. Vigil*,

508 U.S. 182, 190-91 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  In other

cases, however, where an administrative agency has voluntarily placed limits on its otherwise

"unfettered" discretion, that agency must strictly adhere to its self-restricting policies or risk

having its actions declared to be arbitrary and capricious abuses of discretion by the courts.  *See*

*Yang*, 519 U.S. at 32; *see also Amanfi v. Ashcroft*, 328 F.3d 719, 728 (3d Cir. 2003) (reiterating

the Supreme Court's statements in *Yang* regarding potential abuses of discretion by agencies

when they depart from published information limiting their discretion). Additionally, and specifically in the immigration context, the Third Circuit has created a bifurcated analysis to determine whether an agency's actions, such as the AAO's denial of the I-140 filed by Rahman on behalf of Gracias, constitute abuses of discretion. *See, e.g., Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir. 2002). In *Sevoian*, the Third Circuit stated that in order to determine whether an agency's actions constitute an abuse of discretion, a court should first assess whether underlying factual determinations made by the administrative adjudicator are supported by substantial evidence in the record. *Id*. Second, if the administrative adjudicator's factual determinations are not supported by substantial evidence, the court should assess whether the denial of a requested benefit was an abuse of discretion – *i.e*., arbitrary, irrational, or capricious. *Id*. When the rationale in these precedential decisions is applied to the facts, fact finding, and relevant USCIS guidelines in effect at the time Rahman's I-140 was filed, are considered it is clear that the AAO's denial of the I-140 filed by Rahman on Gracias' behalf was arbitrary, capricious, and irrational and, therefore, that the AAO's decision should not be upheld by this Court on appeal.

In this case, at the time the Plaintiff's case was filed, the USCIS Vermont Service center was adjudicating cases in accordance with guidelines published in the minutes from a November 16, 1994 meeting between the AILA Service Center Liaison and the Director of the Vermont Service Center. *See generally* Guevara. That published document indicates that the Vermont Service Center limited its discretion in adjudicating I-140s and took a holistic, totality of the circumstances, approach to assessing an employer's ability to pay a proffered wage. *See Hondros*, 720 F.2d at 294 (noting that agencies are bound by policies published in memoranda and other somewhat informal media such as the minutes in this case). This is consistent with the

24

Plaintiffs' arguments from the inception of this case that the overall financial resources of, and secured by, of Rahman's business, as well as the overall health of his personal finances as a sole-proprietor amply demonstrate that he maintained the ongoing ability to pay Gracias the proffered wage from the time of filing the ETA-750 through the pendency of his I-140 petition. *Id*; *compare* AAO Brief at 3, A.R. 16. Had the AAO properly used the more flexible 1994 minutes' standards to assess the ability of Rahman to pay the proffered wage, it would have been compelled to conclude that Rahman could afford to employ Gracias according to the terms stated in the approved ETA-750, could afford to provide for his family, and, therefore, it would have been compelled to approve his I-140. *See generally* Caputo Letter, A.R. 35-38.

Specifically, the 1994 Minutes list seven principles that Service Center adjudicators should employ when assessing evidence submitted in support of an employer's ability to pay a proffered wage, three of which are applicable in this case. *See* Guevara at 3. First, the 1994 minutes state that if an employer's taxable income exceeds the proffered wage for the period of time during which an ETA-750 and I-140 are pending, then the employer has the ability to pay the proffered wage. *Id*. Second, the 1994 Minutes indicate that even in cases where an employer's tax returns demonstrate losses during the requisite period of time, he may still be able to demonstrate that he has the ability to pay the proffered wage if his financial documents demonstrate a "favorable enough ratio of total current assets to total current liabilities." *Id*. Third, the Service Center's 1994 minutes indicate that in the case of a sole proprietorship, as is the case here, the personal financial circumstances of the proprietor can be taken into consideration in order to find that he has the ability to pay the proffered wage. *Id*. Fourth, contrary to the AAO's decision in this case, the Service Center indicated that depreciation can and should be considered as taxable income for purposes of demonstrating that a prospective

25

employer maintains the ongoing ability to pay a proffered wage. *Id*.

These flexible standards explicitly recognize the importance of considering the totality of a sole-proprietor's financial circumstances were in place throughout the period of time that Rahman's I-140 was pending with USCIS.[9] Rahman understood that his tax returns were not sufficient to demonstrate his ability to pay the proffered wage, and, therefore, he supplied USCIS adjudicators using these flexible standards with his CPA's detailed expert analysis of his overall financial position in order to demonstrate his ability to pay the proffered wage.  As discussed below, USCIS should have used Rahman's CPA's expert analysis of the totality of Rahman's finances to determine that he maintained the ability to pay the proffered wage as required. Adopting Caputo's assessment of the facts would have been consistent with the USCIS guidelines in place at the time the I-140 was filed.  USCIS' failure to use these guidelines amounted to a clear abuse of discretion.  *See Yang,* 519 U.S. at 32.

> 2.  The AAO's Decision in this Case Constitutes Error as a Matter of Law Because it Disregarded an Expert Analysis of the Financial Documents in the Record in <u>Favor of its Own Non-Expert General Analysis of the Documents in the Record.</u>

The AAO's denial of the Plaintiffs' appeal was also erroneous because the AAO substituted its own general knowledge and general assessment of the financial documents in the record for the expertise and specific consideration of the financial documents in the record

---

[9]  These standards are consistent with recent persuasive case law that suggests that immigration officials need to be cognizant of the disparate impact that their decisions will have on small business owners, because they operate very differently than large corporations.  *See, e.g., American Federation of Labor v. Chertoff,* 2007 WL 2972952, at *11-12 (N.D. Cal. 2007) (discussing requirement that agencies conduct "flexibility analyses" when implementing regulations in order to protect small businesses from being harmed by agency action). Moreover, in other immigration contexts, administrative tribunals have held that an individual business owner is far better equipped to judge how his business will fare with the addition of an alien employee than an agency is.  *See Michael Herz Assoc.,* 19 I&N Dec. 558 (Comm. 1988) (holding that business owners are better able to judge whether a proposed foreign employee has the skills required to perform a proposed job than federal agencies are).

provided by Joseph Caputo – a CPA. *See* AAO Decision at 5-6, A.R. 5-6; *see also* Caputo

Letter, A.R. 35-38 (demonstrating multiple ways in which the financial documents in the record

show that Rahman maintained the ability to pay the proffered wage from 2002-2003).

Throughout the AAO's erroneous decision, it suggests that the financial analysis of the

documents in the case provided by the CPA cannot be relied upon as proof of the Plaintiffs'

ability to pay the proffered wage because his statements are not audited or that his analysis of the

financial documents in the record cannot be relied upon as demonstrative of the Plaintiff's ability

to pay the proffered wage because his statements are akin to "statements of management.' AAO

Decision at 7, A.R. 7. However, Caputo is an independent CPA and not part of the management

of Rahman's business. This type of disregard by administrative adjudicators of specific expert

analysis of the facts submitted on behalf of individuals seeking immigration benefits has been

condemned as reversible error by the Third Circuit and other Circuit Courts of Appeal. *See, e.g.,*

*Leia v. Ashcroft,* 393 F.3d 421, 434 (3d Cir. 2005) (finding administrative adjudicator's

determination that specific expert assessment was in the record as "just totally irrelevant" was

erroneous and reversible error); *see also Zhang v. Ashcroft* 382 F.3d 993, 997 (9th Cir 2004).

Accordingly, the AAO's decision should be reversed.

It is well-settled law that administrative adjudicators, such as the AAO in this case,

cannot substitute their own generalized knowledge to deny an individual seeking immigration

benefits relief for specific expert assessment of individuals' cases without providing cogent,

rational explanations for their dismissal of expert analysis. *See, e.g., Leia* 393 F.3d at 434.[10]  In

---

[10] The Plaintiffs' acknowledge the Third Circuit's decision in *Ambartsoumian v. Ashcroft*, 388
F.3d 85 (3d Cir. 2004). There the Third Circuit noted that it was not always appropriate for
administrative adjudicators to defer to the assessment of alleged experts. *See id*. at 93. In that
case, for example, the alleged expert analysis of the individual's case was a professor who
admitted that he had "no real familiarity" with the precise situation of the individuals seeking

*Leia*, an administrative adjudicator disregarded expert testimony regarding country conditions in the Ukraine involving politically active non-ethnic Ukrainians. *Id*. at 429, 433-34. The administrative adjudicator stated that he disregarded the expert assessment of conditions in Ukraine because they were "just totally irrelevant." *Id*. at 434. On appeal, the Board of Immigration Appeals (hereinafter "BIA"), upheld the administrative fact finder's decision because it held, like the AAO held in the Plaintiffs' case, that evidence in the record did not support the individual's request for an immigration benefit. *Id.* When the Third Circuit considered the record in *Leia*, it determined that the BIA's failure to hold the administrative adjudicator responsible for neglecting to appropriately take the expert's assessment of the facts into consideration was clear error and remanded the case to the BIA for further appropriate consideration. *Id*. In another precedential decision, the Third Circuit remanded a case to the Board for further consideration because it failed to appropriately utilize expert analysis of facts in the record in its decision denying an individual the immigration benefits he was seeking. *See Lukwago v. Ashcroft*, 329 F.3d 157, 159 (3d Cir. 2003). *Lukwago* stands for the proposition that when expert analysis of facts in the record are presented by individuals seeking immigration benefits, such as Rahman is in this case, administrative fact finders must meaningfully consider the expert analysis presented. *Id*; *see also Berishaj*, 378 F.3d at 325 (noting that administrative adjudicators are "obliged" to specifically consider evidence submitted by individuals seeking immigration benefits).

---

immigration benefits. *Id*. Rahman and Gracias submit that their case is distinguishable from the situation in *Ambartsoumian* because Accountant Caputo's assessment of Rahman's finances is based on a thorough review of financial documents in the record that the AAO reviewed itself. *See* AAO Decision at 2-3 (cataloging "relevant" evidence in the record), A.R. 2-3; *compare* Caputo Letter, A.R. 35-38 (carefully reviewing financial documents in the record and demonstrating Rahman's ability to pay). Accordingly, this Honorable Court should not be persuaded by any arguments based on *Ambartsoumian* suggesting that the AAO was within its discretion in giving accountant Caputo's letter such short shrift.

When the Third Circuit's decisions in *Leia* and *Lukwago* are applied to the facts in this case, the AAO's substantial error becomes crystal clear.  Although its decision and its rejection of the CPA's assessment of the financial health of Rahman's business and personal assets was not as brazen as the decision in *Leia* labeling the expert assessment in that case as "totally irrelevant," its effect is the same and its substantial error is just as clear.

Further contributing to the erroneousness of the AAO's decision with respect to its treatment of Caputo's expert opinion letter is the fact that the AAO second-guesses his financial expertise when the AAO itself is not expert at financial or tax analysis.  *See, e.g., Ki Se Lee v. Ashcroft*, 368 F.3d 218, 225 n.10 (3d Cir. 2004).  In this case, the AAO attempts to sully Caputo's analysis of Rahman's finances by suggesting that because his assessment of Rahman's business was prepared at Rahman's request it is unreliable.  AAO Decision at 5; A.R. 5 (refusing to accept Caputo's analysis of record evidence for immigration purposes when his tax returns were prepared to reduce his tax liability).  Furthermore, the AAO's decision fails to accept his expert analysis of Rahman's financial situation because Caputo's materials were not audited.  AAO Decision at 7, A.R. 7.  Because the AAO failed to seriously consider Caputo's letter and other materials he prepared in the record, its decision was arbitrary and capricious and must now be reversed by this Honorable Court because when the Caputo's letter is properly assessed it is clear that Rahman maintained the ongoing ability to pay the proffered wage during the period of time required.  *See generally* Caputo Letter, A.R. 35-38.

Caputo's letter clearly articulates reasons why the financial documents in the record demonstrate that Rahman had the ongoing ability to pay the proffered wage for the required period of time. First, Caputo states in his letter that, as discussed above, Rahman's access to a line of credit would enable him to fill any gaps in his ability to pay Gracias the proffered wage or

29

support his family.  Caputo Letter at 1, A.R. 35.  Second, Caputo indicated that it was his

professional opinion that Rahman's tax returns showed losses because he is a cash basis

taxpayer, meaning that he times his expenditures such that his overall tax liability is lessened, or

even eliminated.  *Id.*  Furthermore, Caputo opines in his letter that the fact that Rahman used

cash basis accounting to lower his tax liability to show losses on his tax returns has very little to

do with Rahman's overall cash position or ability to pay Gracias the proffered wage.  *Id.*  Third,

Caputo affirms in his letter that in 2002 and 2003, Mr. Rahman's wife was working at the 7-11

and that Mr. Rahman intended to replace her with Mr. Gracias upon approval of his I-140 and I-

485 based employment authorization.  *Id.*  This would free up over $18,000 from Rahman's 2002

financial documents and more than $21,000 from 2003 that he could use to pay Gracias the

proffered wage.  *Id.*  Fourth, Caputo's letter demonstrates that in 2002 and 2003, Rahman

experienced certain large expenses, such as 7-11 franchising fees, that were one time expenses

and therefore expenses that would not have an impact on his ability to pay the proffered wage.

*Id.* at 36-37.  Fifth and finally, Caputo also stresses the fact that the 7-11 franchise owned by Mr.

Rahman had substantial good will and growing revenues, both of which led him to conclude that

Rahman's franchise is a "strong and thriving business amply capable of accessing the financial

resources for the ability to pay [the proffered wage]."  *Id.* at 35.  The rest of Caputo's letter

meticulously details how the financial documents in the record demonstrate that when assessed

in terms of Rahman's true financial position, instead of his financial position as structured in his

federal tax returns, Rahman had more than enough financial resources to afford to pay Gracias

the proffered wage *and* to support his wife and children.  *See generally id.* at 36-38.

However, instead of relying on Caputo's meticulous, objective, professional analysis and

subsequent explanation of how Rahman had the ongoing ability to pay the proffered wage, the

AAO failed to seriously consider or analyze his statements and expert evaluation but substituted its own financial analysis inappropriately. *See, e.g.*, AAO Decision at 8-9, A.R. 8-9 (declining to accept explanations with respect to various charges Rahman incurred when he purchased the 7-11 franchise because "nothing in the record aside from the certified public accountant's statement" verified that these expenditures were tied to Rahman's purchase of the franchise or that they were, in fact, one time charges). As the Third Circuit stated in *Ki Se Lee*, executive immigration agencies are limited in their expertise to interpreting immigration law and regulations. *See* 368 F.3d 218, 225 n.10 (3d Cir. 2004). Accordingly, the AAO's decision in this case, which impermissibly imposes its own alleged financial expertise to defeat the reasoned, meticulous expertise in Caputo's letter was arbitrary, capricious and an abuse of discretion, which this Honorable Court should now reverse.

A related and further erroneous aspect of the AAO's denial in this case is its misconstruction of some of the statements in Caputo's letter regarding the 7-11's use of cash basis accounting and his assessment of the financial documents in the records from an alternative accounting point of view. *See* AAO Decision at 5; A.R. 5 (stating that it would not consider Rahman's finances in any manner other than the manner in which he presented his finances to the IRS for tax purposes). This is exactly the type of contortion of facts in the record that the Third Circuit held to be reversible error in *Butt.* In that case, as discussed above, an administrative adjudicator adopted a bizarre interpretation of the phrase "under the care of" related to a doctor's treatment of a patient. *See* 429 F.3d at 436. Using this strained definition of a commonly understood phrase, the adjudicator determined that a "cloud" hung over all of the rest of the alien's testimony and evidence and, therefore, the adjudicator refused to grant the alien in *Butt* the immigration benefits he was seeking. *Id.* The Third Circuit held that the

31

adjudicator's flawed conception of what the term "under the care of" tainted the entirety of his analysis of the facts. *Id*. at 438 (stating "[the adjudicator's] flaw colored the whole of the [his] analysis, which was grounded in his incorrect interpretation of the note.") In this case, the AAO's refusal to recognize that Rahman prepared his income tax returns for the express purpose of utilizing the tax code for reducing or eliminating his tax liability, and not for the purpose of proving to an immigration agency that he had the ability to pay a proposed employee the proffered wage, similarly "tainted" its decision. *See* AAO Decision at 5; A.R. 5 (stating that AAO would only consider Rahman's finances as declared to the IRS). Had the AAO properly and flexibly considered the totality of Rahman's finances, as explained by Caputo, instead of taking an unduly constricted stance towards the evidence in the record, it would have been compelled to conclude that Rahman maintained the ability to pay the proffered wage for the required period of time. *See Butt*, 429 F.3d at 438. Accordingly, the AAO's denial of Rahman's I-140 was an abuse of discretion, and this Honorable Court must now enter judgment on the Plaintiffs' behalf, or at a minimum remand their case to the AAO for further consideration consistent with the case law above.

**V.    CONCLUSION**

Based on the facts and law as discussed above, the AAO's denial of the Plaintiff's I-140 was erroneous as a matter of fact and law. Plaintiffs respectfully request that this Honorable Court enter declaratory judgment on their behalf instructing USCIS to approve the I-140 filed on Gracias' behalf by Rahman. Alternatively, and at a minimum, the Court should enter declaratory judgment on the Plaintiff's behalf and remand for further consideration.

**OBERLY, JENNINGS & RHODUNDA, P.A.**

Dated: January 2, 2008      /s/ Karen V. Sullivan
Charles M. Oberly, III (No. 743)
Karen V. Sullivan (No. 3872)
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE 19899
(302) 576-2000 – Telephone
(302) 576-2004 – Facsimile

-and-

David E. Piver
The Law Office of David E. Piver
150 Strafford Ave, Suite 115
Wayne, PA 19087
(610) 975-4599 – Telephone
(610) 687-2100 – Facsimile

Attorneys for Plaintiffs

# EXHIBIT A



**Immigration Daily**

| Workshop | The PERM Workshop New York |

Home Page

**Immigration Daily:** the news source for legal professionals. **Free!** Join 17000+ readers

Enter your email address here:
Enter email address    Go

SEARCH    GO
Advanced search

OnlineVisaCenter.com - Most Affordable Rate For Your Visa/Greencard Needs
H-1B/L-1 Visas, Green Cards – Experienced Attorney, Reasonable Rates
Immigration Forms, Case Management & E-filing: INSZoom.com

IMMIGRANTS & EMPLOYERS
Immigrant's Weekly
Advertise
Discussion board
Immigrationlawwiki
Find a lawyer
Processing times
Immigration forms
Resources

LAWYERS
Immigration Daily
Archives
Classifieds
Seminars
Workshops
Immigration books
Yellow pages
Processing times
Immigration forms
CRS reports
Resources
Joel Stewart
Greg Siskind
Hammond Law Firm

About ILW.COM
Non-profit
Link to us

SUBSCRIBE
Enter email:
**Immigration Daily**
enter email    GO
**Immigrants Weekly**
enter email    GO

Share this page
Bookmark this page
Print this page

Find a Lawyer
State:
All
Find

The Immigration Portal from the

< Back to current issue of Immigration Daily          < Back to current issue of Immigrant's Weekly

## Ability To Pay Issues For The Small Business
### *by Christine Flowers*

It is commonly said that there are only two certainties in life: death and taxes. The seasoned business immigration attorney might expand the list to include the following: The untimely death of an immigrant worker petition when the taxes of the sponsoring employer are insufficient to prove ability to pay. While this writer should be excused for using levity to make her point, the denial of an employment-based petition is no laughing matter to either the employer, employee, or counsel.

According to 8 C.F.R. Section 204.5(g)(2), a U.S. employer seeking to qualify an alien worker for immigrant status must prove, inter alia, that it has the ability to pay the proffered annual wage to the alien beneficiary at the time that the offer of employment was originally made. In cases requiring labor certifications, i.e. second and third preference petitions the relevant date is the certification's priority date. In other words, an employer must provide evidence that the business had sufficient funds to pay the beneficiary's salary as of the date that the 750 ETA forms are filed with the Department of Labor. See generally Matter of Wing's Tea House, 16 I & N Dec. 158 (Acct, Reg. Comm. 1977). Additionally, the employer must be able to prove that it has the wherewithal to pay the salary until the beneficiary attains permanent residence. Given the fact that the entire process from the filing of the labor certification petition until the ultimate approval of an adjustment of status application can last for a number of years, this is a daunting task for the business practitioner who does not have a Fortune 500 company for a client. So how does the small to medium-sized business owner satisfy the ability to pay requirement? What follows are some suggestions gleaned from the author's personal case files.

When seeking to prove ability to pay, the regulations state that acceptable evidence includes "copies of annual reports, federal tax returns, or audited financial statements." Where the sponsor employs more than a hundred workers, the Service Center will accept a statement from the financial officer of the organization. If the foregoing materials are not sufficient to prove fiscal viability, the sponsor may provide "evidence such as profit/loss statement, bank account records, or personnel records…" Id.

As a general rule, there are three basic approaches that can be used to establish a petitioner's ability to pay in the year of filing: (1) the petitioner's net income in the year of filing was equal to or greater than the proffered wage; (2) the petitioner's net current assets in the year of filing were equal to or greater than the proffered wage; and (3) the petitioner paid the beneficiary a salary equal to or greater than the proffered wage in that year. A recent Request for Evidence (RFE) from the Vermont Service Center confirmed that these are the three most common ways of satisfying 8 C.F.R. Section 204.5(g)(2).

However, what happens if the business shows a loss for the relevant year, an all too common occurrence in an economy that has suffered a downturn? The first alternative is to subtract the business' liabilities from its total assets. If the remaining sum is equal to or greater than the proffered wage, 8 C.F.R. Section 204.5(g)(2) is satisfied. There are also situations where the



**leading immigration law publisher - over 25000 pages of free information!**

Copyright
© 1995-2007
ILW.COM,
American
Immigration LLC.

SEARCH   GO

Advanced search

Home Page

alien beneficiary has already been employed by the petitioner. Proof in the form of W-2s or payroll statements would also be useful to show that the business is in a financial position to pay the required salary since, in fact, it has already done so. Unfortunately, the fact that an alien has been employed by the business in the past is no guarantee that the employer will have proof of payment, since many small business owners pay their staff on a cash basis, and don't keep any records.

What alternatives does a petitioner have if neither the taxable income, net assets, or payroll are sufficient to prove that he can pay the proffered salary? A review of several unpublished decisions from the Administrative Appeals Unit show that other sources of income may be considered when assessing fiscal health . In In Re Matter of [Name not Provided], EAC 00 088 52775 (October 1, 2001; Vermont Service Center), the employer, a restaurant, showed a loss of $21,710.00. For this reason alone, the Vermont Service Center denied the petition, holding that the sponsor failed to show that the business had sufficient funds to pay an annual salary of $25,000.00 . On appeal, the AAU reviewed the restaurant's tax returns and observed that the depreciation, tax on hand at year end and taxable income yielded the sum of $32,007.00, which exceeded the proffered annual wage by approximately $7,000.00. It therefore overturned the decision of the Service Center, and approved the Immigrant Worker petition.

Similarly, in In Re Matter of [Name not Provided], EAC01 018 50419 (May 13, 2002, Vermont Service Center), the Service denied the sponsor's petition on the grounds that the business income was $484.00, well below the proffered annual wage of $25,000.00. Holding that when the depreciation was added back to the income, the resulting amount was $50,965.00, the AAU reversed the denial.

In In re Matter of [Name not Provided], EAC 0210353128, (January 10, 2003 Vermont Service Center) the Administrative Appeals Unit again added taxable income, depreciation and cash on hand at the end of the year to find that the petitioning business had the ability to pay the proffered annual wage to the alien beneficiary. This was a significant decision insofar as the original denial was premised upon the fact that the business' liabilities exceeded its assets, even though the business had registered a sufficient sum between profit, depreciation and year-end cash balance.

Recently, the AAU issued a decision which gives the immigration practitioner a powerful tool in assessing ability to pay. There are some cases where, during the year that the offer of employment was made to the alien beneficiary, the business did not show that it could pay an entire year's salary to the employee. This can occur when the economy has taken a downturn, when the business is a start-up, or when the business has had to suspend operations for several months. Is the petition doomed to denial if the business fails to demonstrate that it was in a position to pay the entire salary to the alien beneficiary on the date that the offer was made to him or her? Fortunately, no.

In Re Matter of [Name not Provided], File Number A 96 322 294 (Vermont Service Center April 7, 2004), the AAU made the novel, but eminently reasonable determination that a "petitioner is not obliged to demonstrate the ability to pay the entire proffered wage during [complete fiscal year], but only that portion which would have been due if it had hired the petitioner on the priority date." Id at 4. In other words, the business was only required to show that it had the ability to pay that pro-rata share of the annual wage which would have been owing to the alien beneficiary on the date that the offer was originally made (i.e. the priority date on the labor certification). Following this reasoning, then, if a business files the labor certification application on July 1, 2004, and the proffered annual wage is $24,000.00, the employer need only show that it had the ability to pay six month's worth of salary to the beneficiary or, in this case, $12,000.00. Of course, this does not relieve the employer from showing continued ability to pay the entire annual wage in the subsequent years leading up to the beneficiary's adjustment to permanent residence. However, it is extremely useful in neutralizing a common tactic employed by all of the Service Centers, i.e. denying a petition if ability to pay is not demonstrated when the offer of employment is initially made. 8 C.F.R. Section 204.5(g)(2).

Unfortunately, recent decisions indicate that the Service Centers, the AAU and even the Federal Courts, are becoming much more critical when assessing ability to pay. In many cases, the Service will deny a petition even where it appears that the sponsor had sufficient funds to pay the wage, since they have refused to consider depreciation as well as year-end

cash balance as relevant sources of income. In Chi-Feng Chang v. Thornburgh, 719 F.Supp. 532 (N.D. Texas 1989), the court held that there was no precedent for allowing the petitioner to "add back to net cash the depreciation expense charged for the year." Id. at 537. This reasoning was followed by the AAU in In Re Matter of [Name not Provided], File Number A 96 322 294, supra, and has also been adopted by the Service Centers. This author recently received an RFE with the following language: "The burden is on the petitioner to establish that any deduction on the tax returns was not an actual expense to the enterprise during the time period covered by the document, and that the deduction represents actually available funds. The record does not currently establish that the depreciation/amortization deduction was not an actual expense to the business and that it represents available funds to meet the wage." This type of boiler-plate language is becoming increasingly common in requests for additional evidence. Notwithstanding the foregoing, this author has had some success in arguing that depreciation and year-end cash balance must still be considered when attempting to prove ability to pay.

Indeed, despite what the Service has stated in its most recent opinions, a large number of accountants agree that depreciation must be considered to at least some degree as a viable source of income. As one accountant has noted, and this language has proven useful in winning several recent cases, "depreciation does not represent an expense to the business during the year that it is declared, and must be included as 'income' to the business." This is particularly effective when the petitioner can prove that it has been claimed against fixed assets.

Another source of income which is commonly ignored by the Service is year-end cash balance. This form of income is particularly useful, because it represents funds which would have been immediately available to the business during the fiscal year. If the year-end cash balance is equal to or greater than the proffered wage, this would be satisfactory proof of ability to pay. Even if it does not amount to the entire annual salary, it can be used to supplement the taxable income where the former insufficient.

When approaching ability to pay issues, it is important to remember that adjudicators are not accountants, and need to have the facts explained to them in clear, concise terms. To the extent that not every attorney is also a financial wizard, it is helpful to consult with an accountant and, wherever possible, have them prepare a statement detailing the petitioner's fiscal health. Adjudicators seem more inclined to find that a business has proven its ability to pay the proffered annual wage if they are provided with an expert opinion.

On May 4, 2004, in a Memorandum from William R. Yates, Associate Director of Operations, it was established that a petition could be denied without a request for additional evidence. One such situation is when the record is complete with respect to all of the required initial evidence as specified in regulations and on the petition. Based upon the foregoing, the Service Centers have begun to issue denials on immigrant worker petitions where the initial evidence supplied with the petition does not convince the adjudicator that the employer had the requisite ability to pay. This makes it even more crucial that counsel provide a comprehensive, well-argued and documented explanation as to why the sponsoring business is able to pay the alien beneficiary's salary. It may be the only opportunity that he or she has to win the case.

While the Service Centers are becoming stringent in adjudicating employment-based petitions, and while it is more likely than not that a small business owner will either receive an RFE or, in the worst case scenario, a denial if ability to pay is not immediately ascertainable, creative arguments, the assistance of accounting professionals and citation to prior, favorable decisions (even those without precedential value) are of immense assistance and can represent the difference between a denial and a happy client. That, like death and taxes, is a certainty.

## About The Author

Christine Flowers practices immigration law with the law firm of Joseph M. Rollo and Associates, P.C. in Philadelphia, Pennsylvania. She can be reached at cmf1261@aol.com.

The opinions expressed in this article do not necessarily reflect the opinion of ILW.COM.

Copyright © 1999-2002 American Immigration LLC, ILW.COM

**Immigration Daily:** the news source for legal professionals. **Free!** Join 17000+ readers

Enter your email address here:

Enter email address    Go

Search for: Enter keyword(s)    Search    Advanced search

**Immigrants & Employers**
- Immigrant's Weekly
- Advertise
- Discussion board
- Immigrationlawwiki
- Find a lawyer
- Processing times
- Immigration forms
- Resources

**For Lawyers**
- Immigration Daily
- Archives
- Classifieds
- Seminars
- Workshops
- Immigration books
- Yellow pages
- Processing times
- Immigration forms
- CRS reports
- Resources
- Joel Stewart
- Greg Siskind
- Hammond Law Firm

**About us  |  Non-profit|  Link to us**

**FIND A LAWYER**                                        More options

**State:**          **Specialty:**          **Language:**
All              All                  All              Find

**Share this page  |  Bookmark this page  |  Print this page**
**The Immigration Portal from the leading immigration law publisher**
**Over 25000 pages of free information!**
© Copyright 1995-2007 American Immigration LLC, ILW.COM

Search for: Enter keyword(s)    Search    Advanced search

# EXHIBIT B



## Immigration Daily

| Workshop | The PERM Workshop New York |

**Immigration Daily:** the news source for legal professionals. Free! Join 17000+ readers

Enter your email address here:
Enter email address    [Go]

OnlineVisaCenter.com - Most Affordable Rate For Your Visa/Greencard Needs
H-1B/L-1 Visas, Green Cards – Experienced Attorney, Reasonable Rates
Immigration Forms, Case Management & E-filing: INSZoom.com

Home Page

SEARCH [GO]
Advanced search

**IMMIGRANTS & EMPLOYERS**
Immigrant's Weekly
Advertise
Discussion board
Immigrationlawwiki
Find a lawyer
Processing times
Immigration forms
Resources

**LAWYERS**
Immigration Daily
Archives
Classifieds
Seminars
Workshops
Immigration books
Yellow pages
Processing times
Immigration forms
CRS reports
Resources
Joel Stewart
Greg Siskind
Hammond Law Firm

About ILW.COM
Non-profit
Link to us

**SUBSCRIBE**
Enter email:
**Immigration Daily**
enter email [GO]

**Immigrants Weekly**
enter email [GO]

Share this page
Bookmark this page
Print this page

**Find a Lawyer**
State:
All
[Find]

The Immigration
Portal from the

< Back to current issue of Immigration Daily          < Back to current issue of Immigrant's Weekly

# Procedural And Policy Changes For I-140 Petitions
## by Romulo E. Guevara

In an on-going campaign for backlog reduction, the U.S. Citizenship and Immigration Services (USCIS) has issued two memoranda directing procedural changes and policy clarifications on employment-based petitions, known as a Form I-140 petition.

A previous article (USCIS CLARIFIES ITS POLICIES ON RFEs) addressed two memos issued by William Yates, Associate Director of Operation, on the significance of prior approvals in extension contexts, and procedural guidance with regard to Requests for Evidence (RFE).

This article will focus on the two recent memoranda on I-140s discussing (1) the adjudication of concurrently filed Form I-140 Immigrant Petition for Alien Worker[1] and Form I-485 Application for Adjustment of Status, and (2) the determination of financial ability to pay under 8 C.F.R. Section 204.5(g)(2) when an employer files the Form I-140 petition.[2]

### 1. USCIS Finally Moves Towards Concurrent Adjudication of I-140/I-485s

As background, on July 31, 2002, legacy Immigration and Naturalization Service (INS) promulgated an Interim Final Rule allowing Form I-485, Application to Register Permanent Residency or Adjust Status, to be concurrently filed with Form I-140, Immigrant Petition for Alien Worker. Until the promulgation of this interim rule, Form I-485 could not be filed simultaneously with Form I-140. The Form I-140 had to be approved before Form I-485 could be filed. The Interim Rule allowed the simultaneous filing of Form I-140 and Form I-485 under the employment-based first, second and third preferences. If Form I-140 was filed before July 31, 2002, Form I-485 could be filed with a copy of Form I-797, Notice of Action, establishing prior receipt and acceptance of Form I-140 petition.

The advantage of the Interim Rule centered on the instant availability of all adjustment of status benefits, such as obtaining employment authorization and advanced parole, at the time of filing Form I-140. The Interim Rule also allowed eligible family members, such as the spouse and minor children, to file Form I-485 applications provided each applicant had a visa number currently available and each applicant maintained lawful nonimmigrant status. In the event that lawful nonimmigrant status was not maintained, applicants could potentially seek protection under Sections 245(i) or 245(k), which are provisions that permit those who have violated status to file for adjustment of status under specific circumstances.

The emergence of concurrent filing was, in this writer's opinion, an incomplete benefit. Once processing of Form I-140 was complete and an Approval Notice was issued, applicants had to endure the extensive backlogs of Form I-485 processing. As of this writing, the four USCIS Service Centers process Form I-485 in approximately two years from receipt, regardless of the approval of a concurrently filed Form I-140.

The Ohata Memo of March 31, 2004



**leading immigration law publisher - over 25000 pages of free information!**

Copyright © 1995-2007 ILW.COM, American Immigration LLC.

SEARCH [GO]

Advanced search

Home Page

Fujie Ohata, Director of Service Center Operations, issued a memorandum on March 31, 2004 outlining procedural instructions for concurrent adjudication of concurrently filed Form I-140 and Form I-485s. The memorandum directs the Service Centers to use I-140 processing times as the tracking mechanism for concurrently filed Form I-485, rather than the local I-485 processing times. Therefore, the USCIS will now consider concurrently filed Forms I-140 and I-485 a separate workload from stand-alone Forms I-485.

Beneficiaries of concurrent employment-based filings will greatly benefit from this change in adjudication procedure. The memorandum suggests that I-140 processing dates will be controlling, which is a more favorable measure. With the exception of certain categories in the Vermont Service Center,[3] all the service centers process Form I-140 in approximately two to seven months. Subsequently, when an I-140 approval is issued, the memorandum requires the immediate adjudication of the accompanying Form I-485. However, concurrent adjudication of Form I-485 will take place only if security clearances have been issued (fingerprints and name checks have cleared).

In the event that a Request for Evidence (RFE) must be issued in the I-140 case, the memorandum states that the adjudicator should also review the I-140 filing to determine if it requires additional evidence as well. Because of potential legal conflicts, I-140 and I-485 will have separate RFEs issued, rather than combining the RFE into one document. Each RFE will be mailed separately. If Form G-28 is in the file, both RFEs will be sent together to the attorney or accredited representative of record. The memorandum makes clear that if the I-485 applicant submits a timely response, but the petitioner does not, both Form I-140 and I-485 will be denied. Likewise, if the petitioner files a timely response, but the applicant does not, Form I-140 will be adjudicated on the merits, while Form I-485 will be denied for failure to respond to an RFE. The Service Center Directors have been given a thirty-day moratorium from the date of the memorandum to make implementation procedures in each center.

The Ohata memorandum is a welcomed measure that was long overdue. The concept of concurrent filing should have included the concurrent adjudication procedures of the Ohata memorandum at the time the Interim Rule was promulgated in July 2002. Hopefully, implementation of the memorandum will spark greater speed in adjudication of adjustment of status applications in concurrently filed cases and further reduce the overburdening backlogs at the Service Centers.

## 2. Fine-Tuning Form I-140 Financial Ability Determinations

A contributing factor to the current backlogs at the service centers has been the unnecessary issuance of RFEs. One area that has been subjected to these roadblocks has been the issue of whether a prospective U.S. employer has the ability to pay the proffered wage in certain employment-based immigrant petitions.

The relevant regulation states:

"(2) Ability of prospective employer to pay wage. Any petition filed by or for an employment-based immigrant which requires an offer of employment must be accompanied by evidence that the prospective United States employer has the ability to pay the proffered wage. The petitioner must demonstrate this ability at the time the priority date is established and continuing until the beneficiary obtains lawful permanent residence. Evidence of this ability shall be either in the form of copies of annual reports, federal tax returns, or audited financial statements. In a case where the prospective United States employer employs 100 or more workers, the director may accept a statement from a financial officer of the organization which establishes the prospective employer's ability to pay the proffered wage. In appropriate cases, additional evidence, such as profit/loss statements, bank account records, or personnel records, may be submitted by the petitioner or requested by the Service."[4]

In a memorandum by William Yates on May 4, 2004, policy guidance was issued in anticipation of regulatory amendments to 8 C.F.R.§204.5(g)(2). A discussion of the memo follows.

The Yates Memo on Financial Ability

The Financial Ability memo states that a petitioner must submit the regulatory required evidence of annual reports, federal income tax returns, or audited financial statements as initial evidence of financial ability. It also discusses the circumstances where discretionary evidence may or may not be used.

Required Evidence. Adjudicators must first review the file for any missing initial evidence. Upon review of any one of these items, adjudicators must issue an RFE if any of these initial documents is missing from the record. Second, adjudicators must review Form I-140 for completeness. A mandatory RFE must be issued if Form I-140 is incomplete with regard to the date the petitioning company was established, the current number of employees, and gross and net annual income.

Consistent with the companion memo, Yates states that if the record is complete with respect to all the required initial evidence, adjudicators are not required to issue RFEs for additional evidence to support the financial ability decision on the record and may deny the I-140 petition without an RFE.

After the required evidence of annual reports, federal income tax returns, or audited financial statements is submitted with the I-140 petition, the memo shows how a petitioner can have financial ability to pay the proffered wage through three ways: First, if the **net income** is equal to or greater than the proffered wage, there is financial ability. Second, if the **net current assets** are equal to or greater than the proffered wage, financial ability exists. Finally, a finding of financial ability can also be made by evidence of the **employment of the beneficiary** by the petitioner at the proffered wage level. If any one of these options are not met, the case can be denied.

Unfortunately, the memo disregards long accepted practices, which have permitted a showing of financial ability using a combination of any of the three options listed. For example, let's assume the proffered wage in an I-140 skilled worker case is $90,000 per year. The beneficiary received wages of $60,000 in the year the priority date was established, with minor increases in subsequent years leading to the RFE. Under the first option in the Yates memo, if the petitioner's net income was $20,000, the petitioner would not meet the financial ability test because of a $10,000 deficit. Consequently, the case would be denied. If the third option is used, financial ability test would also fail because the beneficiary was paid less than the proffered wage. The second option is the most limited in that it uses the net current assets analysis in a substantially narrower way than accepted practices.

The Yates memo should have implemented principles established in the minutes of the Eastern Service Center (ESC)/AILA Liaison Teleconference of November 16, 1994,[5] where the then Director of the Vermont Service Center offered these helpful observations:

"(1) If the taxable income on the petitioning company's submitted tax return, for the period covering the priority date for the I-140, is at least as high as the wage offered, the ESC will generally assume that it can afford to pay the wage,

(2) If taxable income is negative even though the beneficiary is not yet employed by the petitioner, ESC will generally assume that the petitioner can handle the additional salary if, according to its tax return, it has **a favorable enough ratio of total current assets to total current liabilities.**

(3) In the case of a sole proprietorship, the ESC may consider the proprietor's personal assets and liabilities.

(4) It will look closely however at the argument that the hiring of the beneficiary will turn an unprofitable company into one that can pay his or her salary.

(5) A positive retained-earnings figure does not guarantee the ability to meet a larger payroll.

(6) Depreciation can generally be considered with taxable income in evaluating the ability to pay the additional employee.

(7) Where the evidence is not self-explanatory, pertinent figures should be highlighted and guidance offered on how the documentation establishes the ability to pay." (Emphasis added).

The Yates memo unnecessarily limits the financial ability examination to the following equation:

Net Current Assets $\geq$ Proffered Wage = Financial Ability.

Item two (2) above suggests that the ratio analysis can be used if there is negative net income and the beneficiary is not yet employed by the petitioner. The rationale is that a favorable ratio suggests the petitioner can handle an additional salary even when there is a loss in the tax year.

However, this writer suggests that the Current Ratio Analysis could be used to determine ability to pay, regardless of negative net income and employment of the beneficiary. According to generally accepted accounting principles, the Current Ratio and the Quick Ratio are basic measures for determining the liquidity of a company. The Current Ratio is determined when dividing the current assets with the current liabilities. The Current Ratio assumes (1) a regular cash flow and (2) that both accounts receivable and inventory can be readily converted into cash. A ratio of 2.0 is a common indicator of healthy financial viability. When the Current Ratio falls lower than 1.0, it indicates a company's financial difficulties. Therefore, the Current Ratio Analysis is a more realistic means to test financial ability than the net asset test described in the memo.

Similarly, depreciation should be added to net income, wages paid to the beneficiary, and the ratio analysis. Depreciation by definition is not considered a loss.

Discretionary evidence. The regulation states, "In a case where the prospective United States employer employs 100 or more workers, the director may accept a statement from a financial officer of the organization which establishes the prospective employer's ability to pay the proffered wage."[6] Subsequently, the regulation lists discretionary evidence which may be asked for by the Service or submitted by the petitioner in appropriate cases. By using the phrase, "in appropriate cases," the drafters intended for the financial ability regulation to have different tiers.

Taken as a whole, the regulation has three tiers: (1) Required evidence; (2) Discretionary evidence for companies with 100 or more employees; and (3) Discretionary evidence in general.

The memo interprets the regulation to permit the submission of additional financial evidence in lieu of the initial required evidence where the petitioner employs more than 100 employees (tying the second and third tiers). Additional financial evidence has always been submitted to bolster either the required evidence or for companies with 100 employees or more. But more disturbing is the expansion of this requirement. Yates states, "regardless of the number of employees the petitioner employs, CIS adjudicators are not required to accept, request, or RFE for additional evidence. Acceptance of these documents by CIS is discretionary." The conclusion is: if the initial evidence submitted does not establish petitioner's financial ability to pay the proffered wage, adjudicators are permitted to outright deny the petition.

The discretionary evidence refers to (1) profit/loss statements, (2) bank account records, or (3) personnel records.[7] The memo leaves the acceptance of this kind of evidence to the adjudicator. If he or she decides to accept the discretionary evidence, Yates states that the evidence must clearly establish petitioner's financial ability. He suggests that each piece of evidence must conclusively show financial ability, rather than allow an adjudicator to make a pragmatic assessment based on the totality of the circumstances.

An employment-based immigrant petition is, in essence, an offer of future employment. The petitioner is not obligated to pay the proffered wage until the beneficiary's legal permanent residence is granted. Therefore, the employer should be allowed to show financial ability from the date the priority date is established to the grant of the beneficiary's permanent residence status.[8]

Suppose an adjudicator chooses not to accept additional discretionary evidence in a particular case. Petitioners have commonly demonstrated financial ability by an examination of bank statements for each calendar year, beginning in the year the priority date was established and continuing onwards. The average of the ending bank balance in a twelve month period, added to the beneficiary's paid wages, and net income or net assets, ordinarily shows financial ability. Petitioners have also used profit/loss statements and personnel records to show available cash flow and ability to meet its payroll obligations. In today's economy, it is unrealistic to expect a single financial document to establish a petitioner's ability to pay without permitting a petitioner the opportunity to provide additional evidence as the regulations allow. A totality of the circumstances test should be used rather than the narrow single-document analysis promulgated by the memo.

It is hoped that the backlog reduction initiatives are implemented in a way that is not detrimental to petitioners and beneficiaries. The concurrent adjudications memo by Ohata is a welcomed measure. But, the Yates memo, on the other hand, offers too narrow a system for determining financial ability. The memo should be reconsidered and broadened to reflect realistic ability to pay valuation methods using the totality of the circumstances test. To do otherwise is to sacrifice legitimate financially viable cases for the sake of backlog reduction.

## About The Author

**Romulo E. Guevara** is the senior associate attorney at Cyrus D. Mehta & Associates, PLLC. He received his J.D. from Hofstra University School of Law in 1996. Prior to joining the firm, he practiced business immigration law and represented clients before Immigration Courts, the Board of Immigration Appeals and consular offices abroad.

The opinions expressed in this article do not necessarily reflect the opinion of ILW.COM.

Copyright © 1999-2002 American Immigration LLC, ILW.COM

**Immigration Daily:** the news source for legal professionals. **Free!** Join 17000+ readers

Enter your email address here:

Enter email address    [Go]

Search for:    Enter keyword(s)    [Search]    *Advanced search*

### Immigrants & Employers
- Immigrant's Weekly
- Advertise
- Discussion board
- Immigrationlawwiki

- Find a lawyer
- Processing times
- Immigration forms
- Resources

### For Lawyers
- Immigration Daily
- Archives
- Classifieds
- Seminars
- Workshops
- Immigration books
- Yellow pages

- Processing times
- Immigration forms
- CRS reports
- Resources
- Joel Stewart
- Greg Siskind
- Hammond Law Firm

**About us | Non-profit | Link to us**

## FIND A LAWYER

More options

| State: | Specialty: | Language: | |
|--------|-----------|-----------|---|
| All | All | All | [Find] |

Share this page | Bookmark this page | Print this page

The Immigration Portal from the leading immigration law publisher
Over 25000 pages of free information!
© Copyright 1995-2007 American Immigration LLC, ILW.COM

Search for:  | Enter keyword(s) |   **Search**   Advanced search